H. W. GROUT, Guardian, Appellant, v. MARY ALLIE FAIRBAIRN et al., Appellees.

**DOWER:** Lands Subject To—Conveyances as Gifts. A surviving wife has no interest in lands which the husband bought and paid for, and which he, without working any fraud upon the wife, and without intending such fraud, caused to be conveyed directly by his vendor to grantees other than himself, *as a gift.*

Headnote 1:  19 C. J. pp. 479, 480.

*Appeal from Black Hawk District Court.*—E. B. STILES, Judge.

NOVEMBER 15, 1927.

This is a suit brought by the guardian of the insane widow of William O. Fairbairn, deceased (intestate), to establish equitable ownership of decedent in, and to partition, a number of town properties, the "naked legal title" to which is alleged to have been taken, at the time of the purchases thereof from decedent's vendors, in his niece, defendant Mary Allie Fairbairn, and his nephews William R. Fairbairn and Henry George Fairbairn. The conveyances to defendants were not to them jointly, but of separate parcels to them severally. Decree for defendants. Plaintiff appeals.—*Affirmed.*

*J. C. Murtagh* and *McCoy & Beecher*, for appellant.

*Mears & Lovejoy* and *Jensen & Gwynne*, for appellees.

MORLING, J.—The question is whether deceased was the equitable owner of the properties (some 16 in number). Decedent bought, paid for, improved, managed, and leased them, and enjoyed the rents and profits. He had life leases from defendants, which will be referred to later. The conveyance of each piece was made from decedent's vendor direct to one of the defendants. The first one is dated January 25, 1906, recorded January 26, 1906, and runs to defendant William R. Fairbairn. William was then a little past 14 years of age. The next one is dated July 24, 1906, and runs to defendant Mary. She was then past 16. May 18, 1907, is the date of the first deed to defendant Henry. He was then not quite 21. From these dates to 1914, like deeds were made, from time to time, to defendants, and recorded, in the total about 16. No sales or conveyances by defendants of any properties are shown. Under date of January 12, 1912, defendant Henry made to decedent a life lease, which required decedent to pay taxes and insurance premiums, and gave him the right to the rents and profits. Under date of August 16, 1915, similar life leases were made by Mary and William of the properties standing in their respective names. Decedent was married February 22, 1884. On May 9, 1885, his wife was committed to a hospital for the insane, and recommitted June 26, 1891, since which time she has been confined in the state hospital or in the county home. The estate is paying for her keep. There were no children. Decedent died seized of the legal title to a farm and town property, unincumbered, of the value of $75,000. He was survived by a brother, Owen Fairbairn, and a sister, Mrs. Nelson, and, as we infer, another sister, Fannie Preston. Mrs. Nelson kept house for him for six or seven years before his death. She has filed a claim against his estate.

A number of deeds to the defendants bear evidence of erasures made at the places where the grantees' names are written. The handwriting and the typewriting in each case appear, however, to be the same as in the rest of the instrument. The deeds do not show what names were previously inserted. In one deed

the name is in a different handwriting, but we are unable to determine, from mere inspection, whether there was a previous erasure. No reference to these matters appears from the record to have been made in the lower court. If the deeds were delivered to and accepted by decedent with his name appearing as grantee, the legal, as well as the equitable, estate would have vested in him; but this is not the theory of the plaintiff's petition or of the trial in the lower court or here. Plaintiff pleaded and conducted the trial on the theory that defendants were invested with legal title. Decedent purchased the properties and paid for them, and the fact that the deeds were originally drawn to him, and before delivery and acceptance contained his name as grantee, if we might assume that fact, would not add to the weight of plaintiff's evidence. There is no presumption that the alteration was made after delivery. *Tharp v. Jamison*, 154 Iowa 77. One of the deeds was executed by the sheriff, on mortgage foreclosure. The certificate of sale was made out to decedent, and assigned to Mary. The date of the assignment, according to the record, appears to have been after expiration of period for redemption. The question whether the assignment was in fact made after such expiration, and as to the effect of it, was not raised in the lower court, and is not discussed here. Neither side differentiates that case from the others, except that it seems to have been assumed that the assignment was made before the decedent's interest became real property. The case turns on the question whether decedent was the equitable owner of the properties.

The motive claimed by plaintiff for intestate's carrying the properties in the names of the defendants is that he might sell them without being required to go into court to divest the inchoate dower right of his insane wife. The minority of the defendants previously noted, existing at the time the earlier deeds were made, and the fact that defendants lived in Illinois, seem to effectually answer this charge; and in taking evidence, plaintiff's witnesses emphasized, as the reason that the deeds were so made, "to keep the insane wife from getting her share." To support this contention, plaintiff introduced the testimony of Mrs. Nelson's son, Bert, and daughter, Mae. They testified, in substance, that, after their uncle's funeral, they had conversations with defendants Mary, William, and Henry, in which de-

fendants said, in substance, that the properties "were put in their names to keep the insane wife from getting the properties, in case of uncle Will's death." Also, "by the property being in their names, it would prevent going into court proceedings." Mae does not say whether or not Owen was there at that particular time. Bert's testimony would raise the inference that he was. Mary, William, and Henry unqualifiedly deny that any such statements were made. Owen says he was about, but that no such conversations occurred in his presence. Mrs. Nelson and an aunt, who, according to Mae and Bert, were present, were not called by either side. That Mae was agitated appears from her statement that:

"They told me that repeatedly, because I fussed with them that the property was in their names."

She struck William with a stove poker, because, as she says, he was abusing her mother. We are not persuaded of the calmness or candor of mind of Mae or Bert. The trial court saw and heard them in giving testimony, and we think properly rejected their evidence.

Bert testifies that, in 1914, decedent "told me about Henry and his wife owning—or he had transferred, rather, the title to Henry and Ida Fairbairn, so that he could sell them at any time he wanted to. Then, in 1916, when I come here, he told me the same thing with Will and Mary Fairbairn. * * * in 1921 he said: 'I wanted to transfer one to your daughter Dorothy, but it was too late before I got it.' * * * Mr. Fairbairn told me he had to keep his insane wife from obtaining any of his property, and he couldn't handle the property in the way of sales if she * * * had part title to it."

In 1914, one of the life leases was in existence (one by Henry and his wife, Ida, which plaintiff thinks was made on account of their marriage). In 1915, the other two life leases were in existence. On February 9, 1916, decedent wrote to W. R. Fairbairn:

"I have a good chance to sell that little house on Maryland St. in Shilliam's Addition at a good price on conditions, and I think you had better let it go as the house must have a lot of repairs. * * * Now if you will make him a deed to the property, I will let him know what you will do in the case. You pay all expenses having the papers made out. Show this letter to your

father and see if he don't think you had better let it go. When I hear from you I will send you the party's name and you have the deed that shows the description * * * I haven't rented the house yet.''

There is no other evidence of any purpose on the part of decedent or defendants to sell any of the property in question. Passing the question of the admissibility of Bert's testimony, we are of the opinion that it is entitled to no weight.

Plaintiff introduced a purported copy of affidavit by W. O. Fairbairn, made in 1901, in which it is stated that his wife was insane, on account of which he did not consider it prudent to hold real estate; that he owned land in the names of certain other persons, of whom Nora B. Saylor is one. Also, purported copy of affidavit made by Nora B. Saylor, July 17, 1902, that title to a tract of land purchased by decedent was taken in her name in trust, to avoid court proceedings. Regardless of other questions of competency or relevancy, we find no evidence that decedent or Nora B. Saylor ever made any such affidavits.

When the decedent's safe was opened, after the funeral, Owen burned some papers taken from it. Owen says that these papers ''regarded trouble between my father and mother. It had no connection with the estate or any of the parties. * * * I did not want them to see this paper, because it was in regard to trouble between my father and mother, and implicated me.'' He says that he burned up a few other papers that were of no account. We discover no evidentiary value in this incident.

Decedent signed and swore to assessment rolls in the usual form, and listed the properties in his own name. These things he might properly do, under his life leases. In speaking of the properties, decedent referred to them as his. They were his for life, and the circumstances under which he made the statements, so far as shown, called for no explanation that his ownership was limited to his lifetime.

Since he owned $75,000 worth of unincumbered real estate in his own name, we see no ground for charging decedent with any purpose to defraud his wife, whose wants would be few. Nor is there any ground for asserting that her prospective heirs had any interest on which to base a charge of fraud.

The motive ascribed by defendants to decedent is that he and his brother, Owen, had been on terms of intimacy from

their early years. Owen had helped him. Decedent was without children of his own. He evidently had an affectionate regard for Owen's children. He was under no legal or moral incapacity to use his money and personal property in making provision for his nephews and niece. If he chose to purchase and improve real property for them, so long as he never had a legal or equitable estate in the realty itself we see no reason why, under the circumstances of this case, he should not be permitted to do so.

We are of the opinion that decedent intended, by the purchase of the properties in controversy and by the improvements he made upon them and by his investments in them, to invest his money and personal property for the benefit of, and to make a gift to, Mary, William, and Henry, and that he had no estate therein open to attack by his widow, or to partition.—*Affirmed.*

EVANS, C. J., and DE GRAFF, ALBERT, and WAGNER, JJ., concur.